UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
LASALLE BANK NATIONAL
ASSOCIATION, TRUSTEE FOR
CERTIFICATEHOLDERS OF                 :
COMMERCIAL MORTGAGE                    :
PASS-THROUGH CERTIFICATES,
SERIES 2002-MWI, BY AND THROUGH        :
GMAC COMMERCIAL MORTGAGE
CORPORATION AS SPECIAL SERVICER,       :

            Plaintiff,                 :

                v.                     :

MERRILL LYNCH MORTGAGE                 :
LENDING, INC.,
                                       :
            Defendant.
------------------------------------x



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED 8 13 07

**OPINION AND ORDER**

04 Civ. 5452 (PKL)



**APPEARANCES**

AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022

Charles D. Riely, Esq.

PATTON BOGGS LLP
2001 Ross Avenue
Dallas, Texas 75201

Talcott J. Franklin, Esq.
Cole A. Wist, Esq.
Nicola M. Shiels, Esq.

<u>Attorneys for Plaintiffs</u>

LANDMAN CORSI BALLAINE & FORD P.C.
New York, New York 10271
120 Broadway
27th Floor
New York, New York 10271-0079

Mark S. Landman, Esq.

POLSINELLI SHALTON WELTE SUELTHAUS PC
700 West 47th Street
Suite 1000
Kansas City, Missouri 64112

<u>Attorneys for Defendants</u>

2



**LEISURE, District Judge:**

Plaintiff, LaSalle Bank National Association, in its capacity as trustee for Certificateholders of Commercial Mortgage Pass-Through Certificates, Series 2002-MWI ("LaSalle"), acting by and through GMAC Commercial Mortgage Corporation, brought this breach-of-contract action against defendant Merrill Lynch Mortgage Lending, Inc. ("Merrill"), alleging Merrill's breach of a Pooling and Servicing Agreement ("PSA"), dated July 10, 2002. The PSA was one of the several agreements pursuant to which a pool of commercial mortgages was securitized. Merrill sold certain loans into the pool. LaSalle alleges that Merrill breached certain express warranties made in connection with one of the loans it sold into the pool. Discovery having closed, plaintiff now seeks summary judgment on the issue of breach of those warranties. Defendant cross-moves on the ground that no genuine issues of material fact exist to support plaintiff's claim that defendant breached two of the subject warranties. For the reasons set forth below, the parties' cross-motions are DENIED.

BACKGROUND

I.   Factual History

    A.   The Trust

The subject of this litigation is a trust fund (the "Trust") consisting of over $1 billion in commercial real estate



mortgage loans. (Pl.'s 56.1 ¶ 1; Def.'s 56.1 Resp. ¶ 1.)[1]  The
Trust was created pursuant to the PSA, a contract through which
Merrill, the "Depositor," sells into the Trust a pool of
commercial mortgage real estate loans, the beneficial ownership
of which is sold to investors (the "Certificateholders") in the
form of certificates signifying their respective ownership
interests in the entire mortgage pool. (Pl.'s 56.1 ¶ 1; Def.'s
56.1 Resp. ¶ 1; Mortgage Loan Purchase Agreement ("MLPA") 1, at
Talcott Decl. Ex. 54; Pooling and Servicing Agreement ("PSA") 1,
at Talcott Decl. Ex. 7.)  The Certificateholders are represented
by plaintiff, the trustee of the Trust.

Merrill's sale of loans into the mortgage pool was made
through a Mortgage Loan Purchase Agreement (the "MLPA") between
Merrill and its affiliate Merrill Lynch Mortgage Investors, Inc.
("Merrill LMI"). (Pl.'s 56.1 ¶¶ 2-3; Def.'s 56.1 Resp. ¶¶ 2-3).
Pursuant to the MLPA, defendant sold to Merrill LMI certain
commercial mortgage real estate loans that Merrill LMI in turn
deposited into the Trust pursuant to the PSA. (Compl. ¶ 3.)  The
MLPA contained a number of representations and warranties
concerning the loans which the MLPA specifically provides are
made for the benefit of Merrill LMI and plaintiff as Trustee to

---

[1] "Pl.'s 56.1" and "Def.'s 56.1" refer to plaintiff's and defendant's
respective statements of undisputed material facts, pursuant to Rule 56.1 of
the Local Civil Rules of the United States District Courts for the Southern
and Eastern Districts of New York ("Local Rule 56.1"), and "Pl.'s 56.1 Resp."
and "Def.'s 56.1 Resp." refer to the plaintiff's and defendant's respective
Local Rule 56.1 responses.

the Certificateholders. (Pl.'s 56.1 ¶ 3; Def.'s 56.1 Resp. ¶ 3;
MLPA § 3(b).)

B.   The Colonial Loan

The loan at the heart of this matter (the "Colonial Loan"
or "Mortgage Loan") was made by defendant to Colonial Exeter,
LLC, an Indiana limited liability company ("Colonial Exeter" or
"Borrower"). (Pl.'s 56.1 ¶ 6; Def.'s 56.1 Resp. ¶ 6.)  Colonial
Exeter's Managing Member is John J. Wanek. (Pl.'s 56.1 ¶ 7;
Def.'s 56.1 Resp. ¶ 7.)  Mr. Wanek indicated that he intended to
use the Colonial Loan to finance the purchase of the Colonial
Village Apartments, an apartment complex in Columbus, Ohio. [2]
(Pl.'s 56.1 ¶ 8; Def.'s 56.1 Resp. ¶ 8.)  The history of the
loan's origination is as follows.  Mr. Wanek submitted a loan
application to defendant on January 17, 2002. (Pl.'s 56.1 ¶ 8;
Def.'s 56.1 Resp. ¶ 8.)  Sometime thereafter, Wanek suggested
that defendant have the subject property appraised by a third-
party appraiser named John Duros. (Pl.'s 56.1 ¶ 10; Def.'s 56.1
Resp. ¶ 10.)  Defendant complied, engaging Duros to perform the
appraisal. (Pl.'s 56.1 ¶ 11; Def.'s 56.1 Resp. ¶ 11.)  On
February 11, 2002, Duros submitted his appraisal report to
defendant, which assessed the value of the property at $14.95

---

[2] Where, as here, one assertion in a Local Rule 56.1 statement or responsive
statement is unsupported in the record, the Court disregards that assertion
but does not disregard other supported assertions simply because those
supported assertions are close by on the page.

million, with a net cash flow ("NCF") of $1,420,226. (Pl.'s 56.1 ¶ 12; Def.'s 56.1 Resp. ¶ 12.)

Plaintiff asserts that defendant believed Duros's appraisal value and NCF were "not credible," and that Duros had "juiced the value way beyond what is reasonable." (Pl.'s 56.1 ¶ 13.) Defendant disputes these claims, arguing that either the statements were taken out of context or were untrue. (Def.'s 56.1 Resp. ¶ 13.)  Plaintiff also asserts that defendant's head of underwriting stated:  "I did not believe -- it was not believable. I didn't believe the value, and I didn't believe the cash flow.  I didn't agree with it." (Pl.'s 56.1 ¶ 14.) Defendant again admits that these statements were made, but contends that they are being referenced out of context. (Def.'s 56.1 Resp. ¶ 14.)  Notwithstanding such beliefs among defendant's employees, plaintiff asserts, defendant filed with the Securities and Exchange Commission a prospectus dated June 18, 2002, and a prospectus supplement dated June 26, 2002 (Pl.'s 56.1 ¶ 15; Def.'s 56.1 Resp. ¶ 15), the latter of which included Duros's appraisal value (Pl.'s 56.1 ¶ 16; Def.'s 56.1 Resp. ¶ 16).[3]

Before the Colonial Loan closed, defendant entered into an Interim Servicing Agreement (the "ISA") with Wachovia Securities

---

[3]  Defendant admits that the prospectus supplement indicated the value of $14.95 million, but adds that it further stated that the loan amount was $9 million and the loan to value ratio was sixty percent. (Def.'s 56.1 Resp. ¶ 16.)



("Wachovia"),[4] pursuant to which Wachovia was obligated to
"service" and "administer" the Mortgage Loan. (Pl.'s 56.1 ¶ 29;
Def.'s 56.1 Resp. ¶ 29.)

On March 27, 2002, defendant closed and funded the Colonial
Loan, a $9 million non-recourse loan to Colonial Exeter (Pl.'s
56.1 ¶ 22; Def.'s 56.1 Resp. ¶ 22; Def.'s 56.1 ¶ 4), and
Colonial Exeter signed and delivered a promissory note in the
amount of $9 million (the "Note" (Joint Submission of Evidence
for Summ. J. Mot. 17)) to Merrill LMI (Pl.'s 56.1 ¶ 22; Def.'s
56.1 ¶ 5). The Note was secured by a multifamily mortgage,
security agreement, assignment of leases and rents and fixture
filing (the "Mortgage" (Joint Submission of Evidence for Summ.
J. Mot. 50)), under which Colonial Exeter granted Merrill a
first priority lien on the Colonial Village Apartments. (Pl.'s
56.1 ¶ 23; Def.'s 56.1 Resp. ¶ 23; Def.'s 56.1 ¶ 6.)

The Mortgage obligated Colonial Exeter to make its monthly
principal and interest payments on the first day of each month
or within five days thereafter. (Note § I(A).) An untimely
payment is considered an "Event of Default" under the Mortgage
and, as such, defendant retained the right -- under both the
Note and Mortgage -- to accelerate the amounts due under the
Note and making the entire debt owed immediately due. (Mortgage

---

[4] The actual party to the contract is First Union National Bank, a
predecessor of Wachovia. (Talcott Decl. Ex. 83.)

§ 11.1(a); Note § VI(A); Pl.'s 56.1 ¶ 26; Def.'s 56.1 Resp. ¶ 26.)  The Mortgage further provides that, during the existence of an Event of Default, defendant may institute foreclosure proceedings on the property. (Mortgage § 11.2(a)(iv).) Additionally, in the event of such an untimely payment, defendant is obligated under the Note to pay to defendant liquidated damages in the amount of five percent of the (untimely) payment due. (Pl.'s 56.1 ¶ 26; Def.'s 56.1 Resp. ¶ 26.)

In connection with its origination of the Colonial Loan, defendant prepared an asset summary report, which it titled a "Merrill Lynch Loan Presentation." (Pl.'s 56.1 ¶ 20.)  Plaintiff alleges that the Loan Presentation document served two functions:  (1) it was reviewed by defendant's credit committee to determine whether to approve the loan; and (2) an edited version of the document was sent by defendant to potential investors and rating agencies so that they could evaluate the loan and decide whether to purchase the loan as part of the pool. (Pl.'s 56.1 ¶ 21.)  Defendant, in response, contends that this report "serves many functions," and that it underwent several revisions and updates as additional information was obtained and requested.  Defendant specifically denies that the report is a "primary" document used by investors and rating

agencies given the existence of the other, more detailed

resources that they use. (Def.'s 56.1 ¶ 21.)

C.   Colonial Exeter's Tardy and Deficient Payments

Colonial Exeter's first monthly payment under the Note was

due May 1, 2002. (Pl.'s 56.1 ¶ 31; Def.'s 56.1 Resp. ¶ 31;

Def.'s 56.1 ¶ 9.)  Wachovia received Colonial Exeter's first

payment on May 3, 2002 (Def.'s 56.1 Resp. ¶ 32; Def.'s 56.1 ¶

10); however, the check was returned to Colonial Exeter on May

20, 2002, for insufficient funds (Pl.'s 56.1 ¶ 32; Def.'s 56.1

Resp. ¶ 32; Def.'s 56.1 ¶ 11).  Wachovia received a replacement

check on May 21, 2002, that cleared.[5] (Pl.'s 56.1 ¶ 33; Def.'s

56.1 Resp. ¶ 33; Def.'s 56.1 ¶ 12.)  Wachovia received a check

from Colonial Exeter on June 6, 2002, in satisfaction of the

monthly payment due June 1, 2002 (Pl.'s 56.1 ¶ 36; Def.'s 56.1

Resp. ¶ 37; Def.'s 56.1 ¶ 13); however, this check, too, was

returned on June 18, 2002, for insufficient funds (Pl.'s 56.1 ¶

37; Def.'s 56.1 Resp. ¶ 37; Def.'s 56.1 ¶ 14).  This fact

notwithstanding, Wachovia received a replacement check the day

prior, on June 17, 2002, which posted on June 18, 2002. (Pl.'s

56.1 ¶¶ 37-38; Def.'s 56.1 Resp. ¶ 38; Def.'s 56.1 ¶ 14.)

Neither of the replacement checks for the May or June 2002

payments included late fees, in the form of liquidated damages,

_____

[5]  Plaintiff disagrees slightly, inasmuch as it contends that, while defendant
claims the replacement check was received on May 21, 2002, it was posted on
May 23, 2002. (Pl.'s 56.1 ¶ 33.)

pursuant to the Note. (Note at § IV; Pl.'s 56.1 ¶¶ 34, 39.)

Defendant so concedes, but explains that the replacement checks

did not include the late fees because such fees were not charged

by Wachovia. (Def.'s 56.1 Resp. ¶¶ 34, 39.)

Defendant claims that it received a check from Colonial

Exeter for satisfaction of the July 2002 payment on July 3,

2002. (Pl.'s 56.1 ¶ 15; Def.'s 56.1 Resp. ¶ 15.)  Plaintiff

claims that this check was not posted until July 8, 2002. (Pl.'s

56.1 ¶ 46; Def.'s 56.1 Resp. ¶ 46.)  This disagreement

notwithstanding, the parties agree that the July 3, 2002, check

was returned for insufficient funds on July 11, 2002. (Pl.'s

56.1 ¶ 46; Def.'s 56.1 Resp. ¶ 46; Def.'s 56.1 ¶ 17.)

Defendant concedes that Wachovia did not send any default

notices for the May and June 2002 payment, did not assess any

late fees (and generally does not assess such late fees during

the first two to three months of a new commercial loan), and

does not consider the accrual of such late charges early on as a

"high priority." (Def.'s 56.1 ¶ 51.)  Plaintiff, in response,

concedes that Wachovia did not send default notices for the May

and June 2002 payments.  Nor does it dispute that Wachovia did

not assess any late fees, or that testimony from Wachovia

employees supports the proposition that Wachovia generally

waives late fees during the first two to three months of a new

commercial loan. (Pl.'s 56.1 Resp. ¶ 51.)  However, plaintiff

10

notes that such waivers were not included in the mortgage file, and that the waivers were not communicated to defendant prior to securitization. (Pl.'s 56.1 Resp. ¶ 51.)

D.   The Creation of the Trust

On July 1, 2002, defendant transferred to Merrill LMI, pursuant to the MLPA, all of its rights under the Note, Mortgage, and all other documents in support of the Colonial Loan. (MLPA §§ 1-2; Pl.'s 56.1 ¶ 49; Def.'s 56.1 Resp. ¶ 49.) On or about July 10, 2002, Merrill LMI entered into the PSA. (Pl.'s 56.1 ¶ 50; Def.'s 56.1 Resp. ¶ 50.)  The parties to the PSA were Merrill LMI as "Depositor"; Wachovia Bank, National Association as "Master Servicer"; Lend Lease Asset Management, L.P. as "Special Servicer"; plaintiff LaSalle as Trustee; and ABN Amro Bank N.V. as "Agent." (Pl.'s 56.1 ¶ 51; Def.'s 56.1 Resp. ¶ 51; Def.'s 56.1 ¶ 19.)  Pursuant to section 2.01 of the PSA, Merrill LMI conveyed to plaintiff, for the benefit of the Certificateholders, all of its right, title, and interest in certain loans, including the Colonial Loan, and certain mortgage loan purchase and sale agreements, including the MLPA. (PSA § 2.01; Pl.'s 56.1 ¶ 52; Def.'s 56.1 Resp. ¶ 52.)

E.   The MLPA's Express Warranties

The MLPA includes a schedule entitled "General Mortgage Representations and Warranties," which contains the warranties plaintiff claims defendant has breached. (MLPA sched. I; Def.'s

11

56.1 ¶ 27; Pl.'s 56.1 Resp. ¶ 27.)   Section 3(b) of the MLPA

states that the representations and warranties included in the

two schedules are made "for the benefit of the Purchaser and the

Trustee for the benefit of the Certificateholders as of the

Closing Date, with respect to (and solely with respect to) each

Mortgage Loan." (MLPA § 3(b)). The pertinent warranties follow.

Sub-section (A) of representation and warranty 14 of the

MLPA provides as follows:

> Other than payments due but not yet 30 days or
> more delinquent, to [Merrill's] actual knowledge,
> based upon due diligence customarily performed with
> the servicing of comparable mortgage loans by prudent
> institutional lenders, there is no material default,
> breach, violation or event of acceleration existing
> under the related Mortgage or the related Mortgage
> Note, and to the Seller's actual knowledge no event
> (other than payments due but not yet delinquent)
> which, with the passage of time or with notice and the
> expiration of any grace or cure period, would
> constitute a material default, breach, violation or
> event of acceleration . . .

(MLPA sched. I, ¶ 14(A).)   Sub-section (B) provides as follows:

"[T]he Seller has not waived any material default, breach,

violation or event of acceleration under such Mortgage or

Mortgage Note, except for a written waiver contained in the

related Mortgage File being delivered to the Purchaser." (MLPA

sched. I, ¶ 14; Def.'s 56.1 ¶ 49; Pl.'s 56.1 Resp. ¶ 49.)

Representation and warranty 24 provides as follows:

"Except as set forth in the related Mortgage File, the terms of

the related Mortgage Note and Mortgage(s) have not been waived,

12



modified, altered, satisfied, impaired, canceled, subordinated
or rescinded in any manner which materially interferes with the
security intended to be provided by such Mortgage." (MLPA sched.
I, ¶ 24.)

      Representation and warranty 36 provides as follows:

> Except as described below, all escrow deposits
> and payments required pursuant to the Mortgage Loan as
> of the Closing Date required to be deposited with
> [Merrill] in accordance with the Mortgage Loan
> documents have been so deposited, are in the
> possession, or under the control, of [Merrill] or its
> agent and there are no deficiencies in connection
> therewith.

(MLPA sched. I, ¶ 36.)

      Finally, representation and warranty 38 of the MLPA
provides as follows:  "The origination (or acquisition, as the
case may be), servicing and collection practices used by
[Merrill] with respect to the Mortgage Loan have been in all
respects legal and have met customary industry standards for
servicing of commercial mortgage loans for conduit loan
programs." (MLPA sched. I, ¶ 38; Def.'s 56.1 ¶ 37; Pl.'s 56.1
Resp. ¶ 37.)

      Section 3(c) of the MLPA governs plaintiff's remedies in
the event of defendant's breach of a warranty.  It states that
upon defendant's discovery of, or receipt of written notice of,
a breach of any of the representations and warranties in the
MLPA or PSA, which include the warranties in dispute, defendant

shall have ninety days to cure such breach, or, in the event

cure is impossible, either repurchase the affected loan or

substitute it with another qualifying loan.[6] (See MLPA § 3(c).)

This section of the MLPA, though, qualifies the type of breach

that may trigger plaintiff's remedy.  The remedy is limited to

only those breaches that "shall materially and adversely affect

the value of the related Mortgage Loan or the interest of the

Certificateholders therein." (MLPA § 3(c).)

II.  Procedural Background

Plaintiff filed its complaint in this action on January 21,

2004, in the Southern District of Ohio.  The complaint alleges

that defendant breached the aforementioned warranties (Compl. ¶¶

36-43), and seeks, inter alia, enforcement of section 2.03(a) of

the PSA and section 3(c) of the MLPA (Compl. Prayer for Relief).

The case was transferred to this District on July 14, 2004, and

defendant answered on August 30, 2004, denying generally

plaintiff's allegations. (Ans. ¶¶ 36-43.)

---

[6]  The section provides in pertinent part as follows:
        If [Merrill] discovers or receives written notice of a
    Document Defect or a Breach pursuant to Section 2.03(a) of the
    [PSA] relating to a Mortgage Loan, then [Merrill] shall not later
    than 90 days from such discovery or receipt of such notice . . .,
    if such Document Defect or Breach shall materially and adversely
    affect the value of the related Mortgage Loan or the interest of
    the Certificateholders therein, cure such Document Defect or
    Breach, as the case may be, in all material respects, . . . or,
    if such Document Defect or Breach . . . cannot be cured within
    such 90-day period, (i) repurchase the affected Mortgage Loan at
    the applicable Purchase Price (as defined in the [PSA]) not later
    than the end of such 90-day period or (ii) substitute a Qualified
    Substitute Mortgage Loan . . . . ."

(MLPA § 3(c).)

14

**DISCUSSION**

I.   Cross-Motions to Strike

Each party has moved to strike certain of the material the other party has submitted in conjunction with these motions for summary judgment, and plaintiff has moved to strike certain portions of defendant's Local Rule 56.1 responsive statement.

Federal Rule of Civil Procedure 56(e) states that affidavits filed in connection with a summary judgment motion "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Accordingly, "[a] court may . . . strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." Hollander v. Am. Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999); accord Rus, Inc. v. Bay Indus., Inc., 322 F. Supp. 2d 302, 307 (S.D.N.Y. 2003); Epstein v. Kemper Ins. Cos., 210 F. Supp. 2d 308, 313 (S.D.N.Y. 2002).

Local Rule 56.1 provides that a motion for summary judgment is to be accompanied by a "short, concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1(a). The party opposing the motion is to provide a responsive statement of

15

"additional material facts as to which it is contended that there exists a genuine issue to be tried. Local Rule 56.1(b) (emphasis omitted). Each statement by the movant or the opponent "must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Local Rule 56.1(d).

The Court may strike, or instead simply disregard, any material that does not comply with Rule 56(e). See Rus, Inc., 322 F. Supp. 2d at 307. Further, assertions in Local Rule 56.1 statements must be disregarded to the extent they unsupported in the record. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003). Here, to the extent the Court has occasion to refer to challenged submissions or challenged Local Rule 56.1 assertions, the admissibility of the submission or assertion is addressed contemporaneously.

II.   Summary Judgment Standards

Federal Rule of Civil Procedure 56 allows for the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the "heavy burden" of demonstrating that no genuine issue as to any material fact

16

exists and that it is therefore entitled to judgment as a matter of law. Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2d Cir. 1999); accord Atl. Mut. Ins. Co. v. CSX Lines, L.L.C., 432 F.3d 428, 433 (2d Cir. 2005) ("'The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment . . . .'" (quoting Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004))); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994) (Kearse, J.) ("The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment . . . .").

"[I]t is a fundamental maxim that on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried." American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 388 F.2d 272, 279 (2d Cir. 1967).  In so determining, a district court "must resolve all ambiguities and draw all inferences in favor of the non-moving party," such that "[i]f there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 145 (2d Cir. 2002); accord Brown v. Cara, 420 F.3d 148, 152 (2d Cir. 2005) ("We will affirm the District Court's grant of summary judgment to defendants only

17

if, based on facts not in genuine dispute and drawing all inferences in favor of plaintiffs, defendants are entitled to judgment on the merits as a matter of law.").

Of course, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). "A dispute as to a material fact is 'genuine,' and hence summary judgment is not appropriate, under this standard, only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at 248); accord N.Y. Stock Exch., Inc. v. New York, N.Y. Hotel LLC, 293 F.3d 550, 554 (2d Cir. 2002) (same). "[T]he law provides no magical talisman or compass that will serve as an unerring guide to determine when a material issue of fact is presented.  As is so often true in the law, this is a matter of informed and properly reasoned judgment." American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 388 F.2d 272, 279 (2d Cir. 1967).

Where, as here, the question before the court on a summary judgment motion concerns the interpretation of a contract, "summary judgment may be granted when its words convey a

18

definite and precise meaning absent any ambiguity." <u>Seiden</u>
<u>Assocs., Inc. v. ANC Holdings, Inc.</u>, 959 F.2d 425, 428 (2d Cir.
1992).  However, "where the language used is susceptible to
differing interpretations, each of which may be said to be as
reasonable as another, and where there is relevant extrinsic
evidence of the parties' actual intent, the meaning of the words
become [sic] an issue of fact and summary judgment is
inappropriate." <u>Id.</u>; <u>accord</u> <u>Painton & Co. v. Bourns, Inc.</u>, 442
F.2d 216, 233 (2d Cir. 1971) (Friendly, J.) ("When a contract is
so ambiguous as to require resort to other evidence to ascertain
its meaning and that evidence is in conflict, the grant of
summary judgment is improper.").  Finally, the Court notes that
where the parties before it have cross-moved for summary
judgment, this fact does not necessitate, without more, an entry
of summary judgment in one party's favor. <u>See</u> <u>American Mfrs.</u>
<u>Mut. Ins. Co.</u>, 388 F.2d at 279; <u>Oil Trading Assocs., Inc. v.</u>
<u>Tex. City Ref., Inc.</u>, 201 F. Supp. 846, 849 (S.D.N.Y. 1962)
("The Court is under no duty to grant summary judgment merely
because both parties have moved for it.").

II.  <u>Breach-of-Warranty Principles</u>

     The Court begins with Judge Learned Hand's definition of
"warranty" as

          an assurance by one party to a contract of the
          existence of a fact upon which the other party may
          rely.  It is intended precisely to relieve the

19





> promisee of any duty to ascertain the fact for
> himself; it amounts to a promise to indemnify the
> promisee for any loss if the fact warranted proves
> untrue, for obviously the promisor cannot control what
> is already in the past.

Metro. Coal Co. v. Howard, 155 F.2d 780, 784 (2d Cir. 1946)

(Hand, J.). This definition has since been adopted for the most

part by the New York Court of Appeals,[7] which views "express

warranties as bargained-for contractual terms." CBS Inc. v.

Ziff-Davis Publ'g Co., 553 N.E.2d 997, 1001 (N.Y. 1990).

Consequently,

> [o]nce the express warranty is shown to have been
> relied on as part of the contract, the right to be
> indemnified in damages for its breach does not depend
> on proof that the buyer thereafter believed that the
> assurances of fact made in the warranty would be
> fulfilled. The right to indemnification depends only
> on establishing that the warranty was breached.

Id. at 1000; see also Bank of Am. Corp. v. Lemgruber, 385 F.

Supp. 2d 200, 229 (S.D.N.Y. 2005) (following Ziff-Davis to

support the proposition that, under New York law, "it is not

reliance on the truth of the warranted information but reliance

only on the existence of the warranty as part of the sales

contract that is necessary to establish a breach of express

warranty claim").

---

[7] The MLPA (MLPA § 14) and PSA provide (PSA § 11.04), and the parties do not
dispute, that New York law governs this action. See LaSalle Bank Nat'l Ass'n
v. Nomura Asset Capital Corp., 424 F.3d 195, 205 n. 7 (2d Cir. 2005) ("'New
York law gives full effect to parties' choice-of-law provisions.'" (quoting
Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996))).

Courts in this District have distilled these principles such that a plaintiff must make a showing of the following four elements to prevail on a breach-of-warranty claim: "(1) plaintiff and defendant entered into a contract; (2) containing an express warranty by the defendant with respect to a material fact; (3) which warranty was part of the basis of the bargain; and (4) the express warranty was breached by defendant." Promuto v. Waste Mgmt., Inc., 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999). Upon such a showing, "plaintiff is entitled to be indemnified for any damages incurred as a result of such breach." Id.

III. Contract Interpretation Principles

Because the parties disagree as to the meaning of a number of the disputed warranties, the Court must seek "to effectuate the intention of the parties as evidenced by the language they used, and [is] therefore bound to enforce the terms of the agreement as set down in an integrated, written instrument." Scholastic, Inc. v. Harris, 259 F.3d 73, 82 (2d Cir. 2001) (citing Wallace v. 600 Partners Co., 658 N.E.2d 715, 718 (N.Y. 1995)); W.W.W. Assocs. V. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990)); accord Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) ("Under New York law, '[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.'" (quoting Greenfield v.

21

Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002))

(alteration in original) (footnote omitted)).

Where the plain terms of a contract are "'complete, clear

and unambiguous,'" the contract should be enforced in accordance

with the plain meaning of its terms, Eternity Global, 375 F.3d

at 177-78; Scholastic, Inc., 259 F.3d at 82 ("If contractual

terms have a definite and precise meaning and are not reasonably

susceptible to differing interpretations, they are not

ambiguous."); however, where the terms are ambiguous, a court

may look to extrinsic evidence to assist in finding the parties'

intended meaning, Scholastic, Inc., 259 F.3d at 82; S. Road

Assocs., LLC v. Int'l Bus. Machs. Corp., 826 N.E.2d 806, 809

(N.Y. 2005) ("'[W]hen parties set down their agreement in a

clear, complete document, their writing should . . . be enforced

according to its terms.'" (quoting Vt. Teddy Bear Co., Inc. v.

538 Madison Realty Co., 807 N.E.2d 876, 879 (N.Y. 2004))).

> A contractual
>
> "ambiguity exists where a contract term could suggest
> more than one meaning when viewed objectively by a
> reasonably intelligent person who has examined the
> context of the entire integrated agreement and who is
> cognizant of the customs, practices, usages and
> terminology as generally understood in the particular
> trade or business."

Eternity Global, 375 F.3d at 178 (quoting World Trade Ctr.

Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d

Cir. 2003))).  The question whether a writing is ambiguous or not is one of law for a court to decide. Id.

If a court finds that the language of a contract is ambiguous, the interpretation of the contract is a question of fact, and summary judgment is usually improper. See, e.g., Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005).  However, "ambiguity itself is not enough to preclude summary judgment.  Rather, in order for the parties' intent to become an issue of fact barring summary judgment, there must also exist relevant extrinsic evidence of the parties' actual intent." Mellon Bank, N.A. v. United Bank Corp. of N.Y., 31 F.3d 113, 116 (2d Cir. 1994).  It is only the "rare case" where the extrinsic evidence is so one-sided that the ambiguity should be resolved as a matter of law. Scholastic, Inc., 259 F.3d at 83.

IV.  The Relevant Standards of Law as Applied to the Parties' Arguments

The first three elements of plaintiff's claim are not disputed: the parties entered into a contract[8] containing express warranties concerning material facts that comprised a part of the parties' bargain. See Promuto v. Waste Mgmt., Inc., 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999).  At issue only is whether

---

[8]  Merrill LMI, and not defendant, was a party to the PSA.  However, Merrill LMI assigned all of its rights under the MLPA, including all rights to enforce the breach of any of the representations and warranties made by defendant under the MLPA, to plaintiff. (See PSA § 2.01; Pl.'s 56.1 ¶ 52; Def.'s 56.1 Resp. ¶ 52.)

23

certain warranties were breached.  The Court's analysis begins
with a determination of the meaning of the respective
warranties.

      1.   <u>Representation and Warranty 38 of the MLPA</u>

     As noted above, representation and warranty 38 of the MLPA
reads:  "The origination (or acquisition, as the case may be),
servicing and collection practices used by [Merrill] with
respect to the Mortgage Loan have been in all respects legal and
have met customary industry standards for servicing of
commercial mortgage loans for conduit loan programs." (MLPA
sched. I, ¶ 38.)  Plaintiff construes this provision to contain
two distinct warranties.

      a.   <u>The Legality of Defendant's Origination of
           the Colonial Loan</u>

     The first warranty in representation and warranty 38 is
that "the origination (or acquisition, as the case may be),
servicing and collection practices used by [Merrill] with
respect to the Mortgage Loan have been in all respects legal."[9]

---

[9]  While defendant cross-moves for summary judgment with respect to
plaintiff's claim of breach of representation and warranty 38, it only moves
as to the claim of breach of the second part of the warranty, as discussed
below.  In its motion, defendant states that "[p]laintiff does not allege
that Merrill's origination practices with respect to the Colonial Loan were
illegal." (Def.'s Mem. Supp. Summ. J. 8.)  Plaintiff's summary judgment
motion as to this warranty is in fact proper, though, as the complaint does
sufficiently allege that defendant's origination practices were illegal.  The
operative allegation in the complaint states that defendant's failure to
adequately perform due diligence on Colonial Exeter "demonstrates that
Defendant's origination practices were not in all respects legal." (Compl. ¶
39(b); Pl.'s Mem. Law Opp'n Mot. 9.)

(Pl.'s Mem. Supp. Summ. J. 5; Def.'s Mem. Opp'n Summ. J. 8.)
Plaintiff claims that defendant breached this warranty because
the origination of the Colonial Loan was not in all respects
legal.  It alleges that defendant's following actions were
"illegal" and therefore in contravention of representation and
warranty 38:  the filing of the Colonial Loan prospectus
supplement, which contained false statements, with the
Securities and Exchange Commission and its disclosure of the
supplement to investors (Pl.'s Mem. Supp. Summ. J. 5); and the
dissemination of the ASR, which contained the same false
statements, to ratings agencies for their review (Pl.'s Mem.
Opp'n Summ. J. 10-17).  Defendant argues that these allegations
are false,[10] but, regardless of their legality, defendant claims
that plaintiff's motion must fail as a matter of law because
both of these acts occurred post-origination during the time
that led up to the securitization of the Colonial Loan.[11] (Def.'s
Reply Mem. Supp. Summ J. 6-7 & n.9.)

---

[10]  Defendant generally disputes these allegations by, for example, pointing
to deposition testimony in which a Merrill employee involved in the
securitization of the Colonial Loan explicitly stated that defendant did not
believe the appraisal was "not credible." (See, e.g., Def.'s 56.1 Resp. ¶
13.)
[11]  The prospectus supplement is dated June 18, 2002. (Talcott Decl. Ex. 154.)
Defendant does not, however, provide an explicit date on which the ASR was
provided to the ratings agencies.  It is clear, though, that its
dissemination was completed after the Colonial Loan closed. (See Def.'s 56.1
Resp. ¶ 21 ("Once the ASR is updated with information on the closed loan and
other loan records that are to be provided to the investors and rating
agencies . . . ."); Rodgers Dep. 239:24-240:14 (stating that the asset
summary is prepared "for securitization" to include "information that we
gather on the loan as it goes through the closing process").)

The meaning of the term "origination" is dispositive to the Court's interpretation of representation and warranty 38. Assuming that defendant's acts were "not legal," they must have been a part of defendant's origination (or servicing or collection) practices with respect to the Colonial Loan for defendant to have breached the warranty.  The term "origination" is not defined in the MLPA or the PSA,[12] nor do the MLPA's other terms, when viewed in their entirety, evince a precise meaning of "origination."  Indeed, it is defendant's argument that plaintiff's claim is a "red herring" because the purported illegal acts occurred, if at all, during the securitization of the loan, a process it alleges to fall outside of the scope of the origination process and accordingly not covered by representation and warranty 38. (Def.'s Reply Mem. Supp. Summ. J. 6.)

The parties thus rely on two conflicting interpretations of the term "origination."  Defendant claims that loan origination consists only of the solicitation of a loan and the subsequent making of such loan through the underwriting process. (Def.'s 56.1 ¶¶ 38-39.)  Plaintiff, citing to an expert report and deposition testimony, agrees that origination includes these processes but contends that the "origination" process extends

---

[12]  The MLPA states that any capitalized terms used in the MLPA but not defined therein "have the respective meanings set forth in the Pooling and Servicing Agreement." (MLPA 1.)

26

through the securitization process.[13] (Pl.'s 56.1 Resp. ¶ 38).  A
review of the plain terms of the MLPA and PSA, shows that, with
respect to this warranty, the parties could not have intended to
include the actual securitization within the meaning of
"origination."  Representation and warranty 38 is written in the
perfective:  the "origination . . ., servicing and collection
practices used by [Merrill] with respect to the Mortgage Loan
have been in all respects legal." (MLPA sched. I, ¶ 38 (emphasis
added).)  Consequently, the only reasonable reading of this
provision is that defendant warranted the legality of certain
services that had already occurred.  Yet the securitization of
the loans occurs pursuant to the PSA, a contract dated ten days
after defendant warranted the legality of its origination
practices in the MLPA.  Thus representation and warranty 38
cannot include within its scope the actual securitization of the
Colonial Loan.  However, plaintiff alleges that origination
includes the entire securitization process, which ostensibly
encompasses steps leading up to the actual securitization.  The
contract documents are silent on whether origination includes
within its scope any actions leading to the securitization.
Consequently, the meaning of the term "origination" is not
wholly unambiguous and thus the intentions of the parties must

---

[13]  Courts look to extrinsic evidence concerning trade usage of a contract
term regardless of whether the term is found to be ambiguous. See, e.g.,
Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir.
1987) (citing N.Y.U.C.C. § 2-202 and Official Comments thereto).

be determined by a trier of fact.  There exists in the record

differing evidence of the parties' intent to allow a trier of

fact to determine the parties' intentions.[14]  See Scholastic,

Inc., 259 F.3d at 83.

             b.     The Meaning of Representation 38's Second

                   Prong

The parties disagree over the meaning of the second

warranty in representation and warranty 38.  Each argues that

its terms are unambiguous; however, they disagree on the import

of the terms.  As stated above, representation and warranty 38

contains two distinct warranties.  The second warranty provides

that the "origination . . ., servicing and collection practices

used by [Merrill] with respect to the Mortgage Loan . . . have

met customary industry standards for servicing of commercial

mortgage loans for conduit loan programs."  (MLPA at sched. I, ¶

38.)

Plaintiff contends that the plain meaning of this warranty

is that each of the origination, servicing, and collection

processes used by Merrill has met customary industry standards

for servicing of commercial mortgage loans.  Defendant argues

---

[14]  For example, while plaintiff cites to certain deposition testimony to the
effect that origination is interpreted to include the subsequent
securitization of a loan (see, e.g., McCoy Dep. 38:25-39:9), there also
exists deposition testimony in which individuals distinguish between loan
origination and securitization as distinct and discreet events (see, e.g.,
Farrell Dep. 7:13-20; Lasater Dep. 10:19-11:12; Roberts Dep. 26:4-27:14) that
would support the idea that securitization is its own event outside the scope
of origination.

that this reading does not work.  Specifically, defendant argues that its origination and collection practices cannot be measured by customary industry standards for servicing.  Rather, defendant argues that the warranty only covers its servicing practices.  The MLPA does not speak to the question of how customary industry practices for servicing can or cannot apply to origination, servicing, and collection, and the parties have offered equally reasonable interpretations of the provision.  The Court thus finds that the warranty is ambiguous.

Contrary to plaintiff's assertion, the evidence is not so one-sided as to demand a finding as a matter of law as to the parties' intent.  The grammatical awkwardness of the warranty itself suggests a scrivener's error, and there is evidence in the record supporting this conclusion. (<u>See</u> Rodgers Dep. 37:22-23).  Consequently, plaintiff has not met the high burden of demonstrating that "there is <u>no</u> extrinsic evidence to support one party's interpretation of the ambiguous language or [that] the extrinsic evidence is so-one [sic] sided that no reasonable factfinder could decide contrary to one party's interpretation." <u>Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 232 F.3d 153,159 (2d Cir. 2000) (Sotomayor, J.) (emphasis added).  Summary judgment is denied.

29

2.   Plaintiff's Claim that Defendant's Servicing

Breached Representations 14(A) and 38

Plaintiff seeks summary judgment on its claim that

defendant's servicing breached warranties found in

representations and warranties 14(A) and 38.   The Court turns to

these arguments.

a.   Representation and warranty 14(A)

Representation and warranty 14(A) of the MLPA reads as

follows:

> Other than payments due but not yet 30 days or
> more delinquent, to the Seller's actual knowledge,
> based upon due diligence customarily performed with
> the servicing of comparable mortgage loans by prudent
> institutional lenders, there is no material default,
> breach, violation or event of acceleration existing
> under the related Mortgage or the related Mortgage
> Note, and to the Seller's actual knowledge no event
> (other than payments due but not yet delinquent)
> which, with the passage of time or with notice and the
> expiration of any grace or cure period, would
> constitute a material default, breach, violation or
> event of acceleration . . . .

(MLPA sched. I, ¶ 14(A).)   Plaintiff construes this provision as

a warrant by defendant of two things:   (1) that it "has no

'actual knowledge' of 'default, breach, violation or event of

acceleration existing under the related Mortgage or the related

Mortgage Note'" and (2) that its "'actual knowledge' is 'based

upon due diligence customarily performed with the servicing of

comparable mortgage loans by prudent institutional lenders.'"

(Pl.'s Mem. Supp. Summ. J. 12.)   Plaintiff contends that

30

defendant breached the first of the two warranties because "[t]he Mortgage Loan was in default due to late payments and, therefore, subject to acceleration," and defendant "had actual knowledge of the May default on the Mortgage Loan prior to securitization." (Pl.'s Mem. Supp. Summ. J. 13.)  It further contends that defendant breached the second of the two warranties because while defendant denies having "actual knowledge" of Colonial Exeter's fraud in procuring the Loan, the existence of which fraud defendant "concede[s]," defendant's ignorance resulted from its failure to conduct the "'due diligence customarily performed with the servicing of comparable mortgage loans by prudent institutional lenders.'" (Pl.'s Mem. Supp. Summ. J. 13.)

Defendant argues that plaintiff's claims are foreclosed as a matter of law because the introductory phrase of representation 14(A) excludes from its scope "payments due but not yet 30 days or more delinquent."  Because plaintiff admits that Colonial Exeter's monthly payments for May, June, and July 2000 were each less than thirty days delinquent, defendant argues that it could not, as a matter of law, have breached these two warranties. (Def.'s Mem. Opp'n Summ. J. 15.)

In its reply brief, plaintiff argues that this introductory clause "exempts only payments that are due <u>on the Closing Date</u>

but not yet thirty days or more delinquent."[15] (Pl.'s Reply Mem.
Supp. Summ. J. 5 (emphasis added).)   Thus, while the May and
June 2000 payments were less than thirty days delinquent, they
do not fall within the provision's exception because "neither
was due on the Closing Date." (Pl.'s Reply Mem. Supp. Summ. J. 5
(emphasis added).)

Further, the warranty must be read in conjunction with
section 2.03(b) of the MLPA, which states that the warranties
contained in the MLPA's schedules, which include representation
and warranty 14, are made "as of the Closing Date." (MLPA §
2.03(b) (emphasis added).)   The Closing Date was July 11, 2002.
Thus, the only reasonable reading of the relevant portion of the
provision is that defendant warrants that, as of July 11,
excluding payments then due but not yet 30 days or more
delinquent, there are no existing material defaults, breaches,
violations, or events of acceleration under the Mortgage or
Mortgage Note.

A plain reading of the warranty thus clearly excludes the
July 2002 payment from its scope because, even though it had not
yet been made, it was less than 30 days delinquent as of July
11, 2002.   As for the May and June 2002 payments, defendant's
argument that the introductory clause excludes those payments

---

[15]   The MLPA defines "Closing Date" as follows:   "The purchase and sale of the
Mortgage Loans shall take place on July 11, 2002 or such other date as shall
be mutually acceptable to the parties to this Agreement." (MLPA 1.)

32

fails because there is no reasonable argument that such payments were "due but not yet 30 days or more delinquent" as of July 11, 2002.  The parties both concede that such payments had been made in May and June, respectively, and therefore were no longer due as of July 11, 2002.

Although the introductory clause of the warranty does not exclude the May and June 2002 payments from the scope of the warranty, a question remains whether the delinquent payments constituted material breaches existing as of July 11, 2002.  Upon defendant's discovery of, or receipt of written notice of, its own breach of any of the representations and warranties in schedule I of the MLPA, including representation and warranty 14, defendant has a ninety-day period to cure such breach "in all material respects, which shall include payment of losses and any Additional Trust Fund Expenses associated therewith." (MLPA § 3(c).)  If such cure cannot be effectuated within ninety days, defendant must either repurchase the relevant Mortgage Loan or substitute it with a qualifying loan, subject to certain exceptions immaterial to this dispute. (MLPA § 3(c).)

The parties agree that the delinquent May 2002 payment was eventually paid on May 23, 2002, and the June 2002 payment was eventually paid on June 17, 2002.  While Colonial Exeter breached the payment terms of the Note by making payment outside of the five-day grace period following May 1 and June 1, those

33

breaches were cured when payment was received in full some time thereafter. Therefore, those breaches were no longer existing as of July 11, 2002.

However, while defendant's acceptance of Colonial Exeter's payments within the ninety-day cure period cured the breaches of the payment terms of the Note, Colonial Exeter failed to pay to defendant the "Late Charge[s]" it was obligated to pay for making payment outside the five-day grace period.[16] (See Note § IV.) Thus, Colonial Exeter's breach of its obligation to pay certain late charges to defendant under the Note was existing as of July 11, 2002. However, whether defendant breached this warranty turns on whether the underlying breach of the Note or Mortgage by Colonial Exeter was material.

Under Ohio law, which governs the terms of the Mortgage, and thus defendant's waiver of any breaches by Colonial Exeter thereunder, the question whether a contractual breach is material is one of fact not suitable for adjudication on summary judgment. See, e.g., Todd v. Heekin, 95 F.R.D. 184, 186 (S.D. Ohio 1982) ("Materiality is a question of fact to be determined

---

[16] The "Late Charge" provision reads as follows:
> In addition to any interest which may be charged hereunder, [Colonial Exeter] shall pay to [defendant] a charge ("Late Charge") for the collection of late payments in an amount equal to five percent (5.0%) of any payment required hereunder (except as specifically set forth in this Section) which is not paid within five (5) days after the Payment Date, as liquidated damages and not as a penalty.

(Note § IV.)

34

by looking at the circumstances of the particular case.");

Unifirst Corp. v. M & J Welding & Mach., Inc., No. 95 Civ. 2401,

1996 WL 547948, at *2 (Ohio Ct. App. Sept. 27, 1996) ("The issue

of whether a material breach of contract has occurred is a

question of fact."); see also Joseph M. Perillo, Calamari &

Perillo on Contracts § 11.18(a), at 432 (5th ed. 2003)

("Materiality of breach is ordinarily a question of fact.").

Consequently, the question of defendant's breach of this

warranty cannot be resolved as a matter of law on summary

judgment.

          b.    Representation and Warranty 38

     Plaintiff also moves for summary judgment on its claim that

defendant's servicing practices breached representation and

warranty 38.  For the reasons set forth in section IV.1.b.

above, the interpretation of representation and warranty 38

presents genuine issues of material fact.  Summary judgment is

thus denied.

          3.    Plaintiff's Claim that Defendant's Waiver of

                Certain Payment Defaults Breached Representations

                and Warranties 14(B) and 24

          a.    Representation and Warranty 14(B)

Representation and warranty 14(B) provides that

          the Seller has not waived any material default,
          breach, violation or event of acceleration under such
          Mortgage or Mortgage Note, except for a written waiver

                              35

> contained in the related Mortgage File being delivered
> to the Purchaser, and pursuant to the terms of the
> related Mortgage or the related Mortgage Note, and
> other documents in the related Mortgage File[,] no
> Person or party other than the holder of such Mortgage
> Note may declare any event of default or accelerate
> the related indebtedness under either of such Mortgage
> or Mortgage Note.

(MLPA sched. I, ¶ 14(B).)  Plaintiff claims that defendant

materially breached the warranty in representation and warranty

14(B) by failing to include in the "Mortgage File"[17] its waiver

of the May and June 2002 payment defaults.  Defendant cross-

moves for summary judgment on the ground that any late payments,

while defaults, were immaterial, and therefore defendant cannot

be found to have breached the warranty as a matter of law.[18]  The

parties do not claim that this representation is unambiguous.

They instead disagree about whether Colonial Exeter's late May

and June 2002 payments, which defendant does not dispute were

untimely, constitute material defaults under the Mortgage or the

Note.

The warranty is unambiguous.  Defendant warrants that it

has not waived "any material default, breach, violation or event

---

[17]  "Mortgage File" is defined in the MLPA as the file of documents
accompanying each respective Mortgage Loan that is delivered to the Trustee.
It includes "the original executed Mortgage Note including any power of
attorney related to the execution thereof" and other related documents; "an
original or copy of the Mortgage" and other related assignments and other
documents; and "an original or copy of any related Assignment of Leases" and
other related documents. (MLPA ¶ 2(c).)
[18]  Plaintiff points out that defendant's cross-motion is one for partial
summary judgment because defendant does not seek to dismiss plaintiff's claim
that defendant also breached representation 14(B) on the ground that it
failed to place a written waiver in the Mortgage File. (Pl.'s Mem. Law Opp'n
Mot. 17 n.76.)



of acceleration under such Mortgage or Mortgage Note," but that
if such a waiver has been made, it must be put in writing and
placed in the Mortgage File.  However, the question of
materiality of the defaults cannot be decided as a matter of
law.  As discussed above, Ohio law treats the materiality of
breach as a question of fact.  Accordingly, summary judgment is
denied.

> b.   <u>Representation and Warranty 24</u>

Representation and warranty 24 reads as follows:

> Except as set forth in the related Mortgage File,
> the terms of the related Mortgage Note and Mortgage(s)
> have not been waived, modified, altered, satisfied,
> impaired, canceled, subordinated or rescinded in any
> manner which materially interferes with the security
> intended to be provided by such Mortgage.

(MLPA sched. I, ¶ 24.)  The meaning of this warranty is not in
dispute.  Plaintiff argues that defendant breached this warranty
in two separate ways.

Plaintiff's first argument is that after Colonial Exeter's
untimely May and June 2002 payments, defendant waived its right
under the Note to (1) accelerate payment under the Note and (2)
enforce Colonial Exeter's obligation to pay to defendant "Late
Charge[s]" for its delinquency. (Pl.'s Mem. Supp. Summ. J. 17.)
Defendant claims that the two late payments can only be
characterized as non-material defaults under the Note and
Mortgage and, as such, plaintiff has failed to show as a matter

37

of law that defendant's waivers "materially interfered with the
security intended to be provided by such Mortgage." (Def.'s Mem.
Opp'n Summ. J. 19.)   The Court agrees that plaintiff has not
borne its burden of demonstrating that, as a matter of law,
these waivers materially interfered with the security.   As the
agreement is silent on what constitutes material interference in
this case, a jury will make the determination.

Plaintiff's second argument is that defendant breached this
warranty as a matter of law because a term of the Mortgage has
been "impaired" to such a degree that the impairment materially
interfered with the security provided by the Mortgage.   The
alleged impairment occurred through the fraud Colonial Exeter
perpetrated in procuring the Mortgage. (Pl.'s Mem. Supp. Summ.
J. 18-20.)   Under plaintiff's view, "[r]epresentation 24 does
not require action or inaction on Defendant's part with respect
to the mortgage being "'impaired.'   It is an absolute
representation that the Mortgage terms have not been impaired,
and Defendant is strictly liable for its violation." (Pl.'s Mem.
Supp. Summ. J. 19 (footnotes omitted).)   Defendant responds by
arguing that this warranty is not implicated by the fraudulent
conduct of the borrower:   "the series of actions that are
described in this representation, i.e., waiving, modifying,
altering, satisfying, impairing, canceling, subordinating or
rescinding any terms of the Mortgage Note, are all actions that

are (or not taken) by a <u>Mortgage Loan Seller</u>, not the borrower."
(Def.'s Mem. Opp'n Summ. J. 19.)[19]

Plaintiff's argument crucially fails to address how the borrower's fraud impairs the terms of the Mortgage themselves rather than simply breaching the Mortgage. The borrower's fraud undisputedly breached the terms of the Mortgage. (<u>See</u> Pl.'s 56.1 ¶ 24; Def.'s 56.1 Resp. ¶ 24.) However, a breach of the terms of the Mortgage does not impair those terms; the terms remain in full effect in spite of a breach. Plaintiff's reading of the warranty leads to the conclusion that the borrower, simply through breaching the terms of the Mortgage, has the power unilaterally to "waive[], modif[y], alter[], satisf[y], impair[], cancel[], subordinate[] or rescind[]" the terms of the Mortgage. (MLPA sched. I, ¶ 24.) This reading is unreasonable. Summary judgment is denied as to this warranty.

    4.  <u>Plaintiff's Claim that Defendant Breached</u>
        <u>Representation and Warranty 36 Because the</u>
        <u>Borrower's July 2002 Payment Was Untimely</u>

Plaintiff's final claim is that defendant breached representation and warranty 36, which reads

---

[19]  Defendant's argument that this claim is one not previously mentioned in plaintiff's "lawsuit correspondence with Merrill, the Complaint, or even in their expert's reports and/or testimony" is unfounded. (Def.'s Mem. Law Opp'n Mot. 19.) The complaint clearly makes a claim for the breach of four separate representations and warranties in the MLPA, including representation and warranty 24. (Compl. ¶¶ 27, 37.) Included among the bases of breach of the various representations and warranties is the ground that defendant failed to conduct any due diligence on Wanek. (Compl. ¶ 39(b).)



> [e]xcept as described below, all escrow deposits and
> payments required pursuant to the Mortgage Loan as of
> the Closing Date required to be deposited with the
> Seller in accordance with the Mortgage Loan documents
> have been so deposited, are in the possession, or
> under the control, of the Seller or its agent and
> there are no deficiencies in connection therewith.

(MLPA sched. I, ¶ 36.)  Plaintiff argues that, because Colonial

Exeter's July 2002 payment was late, defendant breached this

warranty.[20]

Plaintiff claims that defendant breached this warranty when

the Borrower's July 2002 payment, which was received on July 3,

2002, was returned to the borrower for insufficient funds on

July 11, 2002.  This, it alleges, was a breach because (1) there

was no "payment" in defendant's "possession" because the check

was not backed by sufficient funds and (2) there was a

"deficienc[y] in connection" with such payment because the check

was not backed by sufficient funds. (Pl.'s Mem. Supp. Mot. 22-

23.)  Defendant argues that material issues of fact exist as to

whether the July 2002 payment was or was not in its "possession"

as of the time the securitization closed.  Its secondary

argument is that, even assuming defendant has breached the

warranty, plaintiff has not demonstrated that such a breach was

material.

---

[20] Although defendant's expert provides a reading of this warranty that
conflicts with plaintiff's reading, defendant does not adopt this reading in
its memorandum of law.  Rather, the parties agree on the meaning of the
warranty.



The Court does not reach defendant's first argument because, regardless of whether the July 2002 payment of principal and interest was in its possession, there clearly were "deficiencies" in connection with the payment:  as defendant concedes, that check was returned on July 11, 2002, because of insufficient funds. (Def.'s 56.1 Resp. ¶ 46.)

Defendant's second argument is that, even assuming defendant's breach, issues of material fact exist as to whether, pursuant to section 3(c) of the MLPA and section 2.03(a) of the PSA, such breach "materially and adversely affect[s] the value of the related Mortgage Loan or the interest of the Certificateholders therein."  In support of this contention, defendant cites to the deposition testimony of one of its employees and an expert which alleges that the July 2002 payment was later made on July 28, 2002. (Kok Dep. 70:14-71:22.) Consequently, because defendant was made whole on that required payment shortly after the Closing Date, the value of the Colonial Loan, and the interests of the certificateholders was not materially and adversely affected. (Sipple Dep. 82:22-83:4.)[21]  The Court finds that such evidence raises genuine issues of material fact which preclude the entry of summary judgment.  As discussed above, the question of the materiality

---

[21] Contrary to defendant's contention (Def.'s Mem. Supp. Mot. Strike 24), Local Rule 56.1 does not deprive the Court of the power to conduct its own review of the record. See Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001).

41

of a party's contractual beach is a question better suited for resolution by a jury than this Court.

## CONCLUSION

For the reasons set forth herein, the parties' cross-motions for summary judgment are DENIED and the cross-motions to strike are DENIED in part and DISMISSED AS MOOT in part.  A pretrial conference is scheduled for 11:30 a.m. on October 4, 2007, at 500 Pearl Street, Courtroom 18B, New York, New York.

**SO ORDERED.**

**New York, New York**

August 13, 2007

_____

U.S.D.J.

42